UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-1052

UNITED STATES OF AMERICA,
Appellee,

v.

FRANK P. BONGIORNO,
Defendant, Appellant.



No. 96-1560

UNITED STATES OF AMERICA,
Plaintiff, Appellee,

v.

FRANK P. BONGIORNO,
Defendant, Appellant.



APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge] 



Before

Selya, Circuit Judge, 
Bownes, Senior Circuit Judge, 
and Boudin, Circuit Judge. 



Thomas V. Silvia for appellant. 
Jeanne M. Kempthorne and Christopher Alberto, Assistant 
United States Attorneys, with whom Donald K. Stern, United States 
Attorney, was on brief, for appellee.



February 7, 1997


SELYA, Circuit Judge. In many respects the history of SELYA, Circuit Judge. 

this litigation resembles a Greek tragedy, excerpts of which from

time to time have occupied the attention of no fewer than ten

federal and state judges across the nation. This particular

passage revolves around the constitutionality of the Child

Support Recovery Act (CSRA), 18 U.S.C. 228 (1994), and the

federal government's authority, if any, to collect restitutionary

payments ordered under the CSRA by recourse to the Federal Debt

Collection Procedure Act (FDCPA), 28 U.S.C. 3001-3308 (1994).

The CSRA issue is new to us and the FDCPA issue has not, to our

knowledge, been addressed by any court of appeals. After sorting

through these and other arcana, we reject the defendant's

challenge to his criminal conviction and sentence, holding, among

other things, that Congress did not exceed the bounds of its

constitutional power in enacting the CSRA. Turning to post-

conviction events, we hold that the federal government lacks

authority to proceed against a "deadbeat dad" by using the FDCPA

as an instrument for enforcing a restitutionary order issued in

connection with an antecedent criminal conviction.

I. SETTING THE STAGE I. SETTING THE STAGE

In October 1990 a Georgia state court entered a decree

ending Sandra Taylor's marriage to defendant-appellant Frank P.

Bongiorno, granting Taylor custody of the couple's minor

daughter, and directing Bongiorno (a physician specializing in

bariatric surgery) to pay $5,000 per month in child support.

Shortly thereafter, mother and daughter repaired to

2

Massachusetts. When Bongiorno subsequently sought to modify the

child support award, Taylor counterclaimed on the ground that

Bongiorno had failed to make the payments stipulated in the

original decree. In September 1992 the Georgia court found

Bongiorno in contempt for failing to pay upward of $75,000 in

mandated child support and directed that he be incarcerated until

he had purged the contempt. Bongiorno avoided immurement only

because he had accepted a position in Michigan and the contempt

order did not operate extraterritorially.

Once in Michigan, Bongiorno made sporadic payments of

child support despite the fact that his new post paid $200,000

per year. In March 1993 a Michigan state court domesticated the

Georgia support order and authorized garnishment of Bongiorno's

wages to satisfy the accumulated arrearage. Soon thereafter,

Bongiorno quit his job and paid only $500 a month in child

support from June to December 1993. In early 1994 Bongiorno went

to work for the State of Michigan. That May a Michigan state

court issued an order enforcing the Georgia support award to the

extent of $300 per week.1 Bongiorno failed to satisfy even this

modest impost.

Approximately one year later the federal behemoth

stirred; the United States charged Bongiorno with violating the
 

1Differences in state law explain this ceiling. The
Michigan court applied Michigan's child support guidelines, Mich.
Comp. Laws 552.519 (1988), to determine a current support
obligation and then added a premium to be applied against
Bongiorno's accumulated arrearages. Neither the propriety of the
ceiling nor the Michigan court's treatment of the Georgia court's
decree is at issue here.

3

CSRA. Because Bongiorno's minor daughter has resided

continuously in Massachusetts from 1990 forward (albeit with her

grandmother for much of that time), the government preferred

charges in that district. Bongiorno moved unsuccessfully to

dismiss the indictment on the ground that the CSRA represents an

unconstitutional exercise of Congress' power under the Commerce

Clause. At an ensuing bench trial, the district court determined

that Bongiorno had possessed the ability to pay $5,000 monthly in

the 1992-1993 time frame, but that he had chosen not to do so.

Consequently, the court found Bongiorno guilty of willful failure

to pay child support and sentenced him to five years of

probation. As a condition of probation, the court imposed a

work-release arrangement, directing Bongiorno to spend up to

twelve hours per day in the custody of the Bureau of Prisons for

the first year of his probation. As a further condition, the

court ordered restitution in the sum of $220,000 (a figure

approximating the total arrearage then outstanding).

Not content with its apparent victory, the government

commenced a civil proceeding under the FDCPA as a means of

enforcing the restitutionary order. After some procedural

wrangling, the court granted the government's motion to attach

Bongiorno's wages and disburse the proceeds.

Bongiorno filed timely appeals in both cases, and we

heard the appeals in tandem. We now affirm the conviction and

sentence in the criminal case, but reverse the judgment in the

civil case.

4

II. THE CONSTITUTIONALITY OF THE CHILD SUPPORT RECOVERY ACT II. THE CONSTITUTIONALITY OF THE CHILD SUPPORT RECOVERY ACT

Bongiorno challenges his conviction principally on the

ground that the CSRA is an unconstitutional exercise of Congress'

authority under the Commerce Clause. We review de novo

constitutional challenges to federal statutes. See United States 

v. Gifford, 17 F.3d 462, 471-72 (1st Cir. 1994). 

A. The CSRA and Its Prologue. A. The CSRA and Its Prologue. 

In 1992 Congress focused on the importance of financial

support from non-custodial parents as a means of combatting the

growing poverty of single-parent families. The House Judiciary

Committee observed that of $16.3 billion in child support

payments due in 1989, only $11.2 billion was paid, leaving a

shortfall of approximately $5 billion to be offset largely

through government assistance. See H.R. Rep. No. 102-771, at 5 

(1992). The Committee concluded that "the annual deficit in

child support payments remains unacceptably high," especially "in

interstate collection cases, where enforcement of support is

particularly difficult." Id. To illustrate this point, the 

Committee noted that one-third of all uncollected child support

obligations involved non-custodial fathers living out of state

and that roughly fifty-seven percent of the custodial parents in

such situations received support payments "occasionally, seldom

or never." Id. 

Because Congress doubted the states' ability

efficaciously to enforce support orders beyond their own borders,

see id. at 6 (recognizing that "interstate extradition and 

5

enforcement in fact remains a tedious, cumbersome and slow method

of collection"), it devised a federal solution hoping that the

new law the CSRA would prevent delinquent parents from

"mak[ing] a mockery of State law by fleeing across State lines to

avoid enforcement actions by State courts and child support

agencies." 138 Cong. Rec. H7324, H7326 (daily ed. Aug. 4, 1992)

(statement of Rep. Hyde). In final form the statute makes

willful failure "to pay a past due support obligation with

respect to a child who resides in another State" a federal crime.

18 U.S.C. 228(a). A "past due support obligation" is an amount

determined under a state court order that either has remained

unpaid for more than one year or is greater than $5,000. See id. 

228(d)(1). The law subjects violators to a panoply of

punishments, including imprisonment, fines, and restitution. See 

id. 228(b) & (c). 

B. The Commerce Clause. B. The Commerce Clause. 

The Commerce Clause bestows upon Congress the power,

inter alia, to "regulate Commerce . . . among the several 

States." U.S. Const., art. I, 8, cl. 3. The appellant claims

that the CSRA which in his case has the effect of regulating

the nonpayment of Georgia-imposed child support obligations owed

by a Michigan resident to a child domiciled in Massachusetts2 

does not fall within the ambit of this constitutional grant. The

 

2Technically, child support is owed to the custodial parent
for the benefit of the minor child. For simplicity's sake,
however, we choose to reduce the triangle to a straight line and
treat the obligation as if it were owed directly to the minor.

6

Supreme Court has identified three general categories of activity

that lawfully can be regulated under the Commerce Clause: (1)

activities that involve use of the channels of interstate

commerce, (2) activities that implicate the instrumentalities of

interstate commerce (including persons or things in interstate

commerce), and (3) activities that have a substantial relation

to, or substantially affect, interstate commerce. See United 

States v. Lopez, 115 S. Ct. 1624, 1629-30 (1995); Perez v. United 

States, 402 U.S. 146, 150 (1971). 

While the CSRA is likely supportable under more than

one of these rubrics, we believe that its validity is most easily

demonstrated in terms of the second class of activities. In

other words, because paying court-ordered child support occurs in

interstate commerce when the obligated parent and the dependent

child reside in different states, the underlying support

obligation is subject to regulation under the Commerce Clause.

Accord United States v. Hampshire, 95 F.3d 999, 1003 (10th Cir. 

1996) (holding that the CSRA regulates a "court-ordered

obligation to pay money in interstate commerce"), cert. denied, 

S. Ct. (1997); United States v. Mussari, 95 F.3d 787, 790 

(9th Cir. 1996) (concluding that the support obligation is a

"thing" in interstate commerce because it must be met "by a

payment that will normally move in interstate commerce by mail,

by wire, or by the electronic transfer of funds"); United States 

v. Sage, 92 F.3d 101, 106 (2d Cir. 1996) (similar to Hampshire), 

cert. denied, S. Ct. (1997). 

7

The appellant employs various artifices in attempting

to resist the force of this conclusion. For starters, he

protests that the obligation to pay child support is not

"commerce" in any meaningful sense. That cry is drowned out by

the broadcast definitions of the term used by the Supreme Court

from the early days of the Republic, see, e.g., Gibbons v. Ogden, 

22 U.S. (9 Wheat.) 1, 189-96 (1824), as refreshed by more recent

Supreme Court jurisprudence, see, e.g., Heart of Atlanta Motel, 

Inc. v. United States, 379 U.S. 241, 253-58 (1964). The term 

"commerce" in the Commerce Clause context is a term of art, and

the Court consistently has interpreted it to include transactions

that might strike lay persons as "noncommercial." See, e.g., 

United States v. Simpson, 252 U.S. 465, 466 (1920) (defining 

commerce to include transporting whiskey intended for the

transporter's personal consumption); Lottery Case (Champion v. 

Ames), 188 U.S. 321, 354 (1903) (defining commerce to include 

carrying lottery tickets).

The appellant is likewise fishing in an empty pond when

he baldly proclaims that a support obligation is an intangible

and therefore not a "thing" in interstate commerce. The Court

has long read the Commerce Clause to reach transactions

concerning intangibles. See, e.g., United States v. South- 

Eastern Underwriters Ass'n, 322 U.S. 533, 549-50 (1944) (holding 

that transactions may constitute commerce although they do not

"concern the flow of anything more tangible than electrons and

information"); Pensacola Tel. Co. v. Western Union Tel. Co., 96 

8

U.S. (6 Otto) 1, 11 (1877) (defining interstate commerce to

include the transmission of intelligence over interstate

telegraph lines). As the Court explained in United States v. 

Shubert, 348 U.S. 222 (1955), commerce exists where there is a 

"continuous and indivisible stream of intercourse among the

states" involving the transmission of money and communications.

Id. at 226 (quoting South-Eastern Underwriters, 322 U.S. at 541). 

This definition fits the economic realities incident to

child support orders involving a parent in one state and a child

in another. Because compliance with such support orders requires

the regular movement of money and communications across state

lines, such transactions fall within the scope of permissibly

regulated intercourse. See Hampshire, 95 F.3d at 1003; see 

generally Comment, Making Parents Pay: Interstate Child Support 

Enforcement After [Lopez], 144 U. Pa. L. Rev. 1469, 1505-11 

(1996). It follows inexorably that Congress lawfully can pass

legislation designed to prevent the frustration of such

interstate transactions. See, e.g., Allenberg Cotton Co. v. 

Pittman, 419 U.S. 20, 34 (1974) (holding that Congress can 

prevent the obstruction of interstate commerce by obviating state

laws); Heart of Atlanta Motel, 379 U.S. at 275-76 (holding that 

Congress has power to remove impediments to interstate commerce).

The CSRA is such a law. It regulates the nonpayment of

interstate child support obligations. Because child support

orders that require a parent in one state to make payments to a

person in another state are functionally equivalent to interstate

9

contracts, see Sage, 92 F.3d at 106, such obligations are 

"things" in interstate commerce. Thus, it is appropriate for

Congress to enact legislation that will prevent their

nonfulfillment. On this basis, the CSRA is a valid exercise of

congressional power under the Commerce Clause. See Hampshire, 95 

F.3d at 1003-04 (upholding the constitutionality of the CSRA on

the ground that it regulates "what is essentially nonpayment of a

debt where the judgment creditor and judgment debtor are in

different states"); Mussari, 95 F.3d at 790 (reaching the same 

conclusion and observing that a delinquent parent's "intentional

refusal to satisfy the debt is as much an obstruction of commerce

between the states as any act of extortion made unlawful by the

Hobbs Act"); Sage, 92 F.3d at 105-06 (reaching the same 

conclusion and observing that Congress "surely has power [under

the Commerce Clause] to prevent the frustration of an obligation

to engage in interstate commerce").

The appellant makes two last-ditch arguments on this

point. First, he posits that cases such as Hampshire, Mussari, 

and Sage went awry because they did not recognize that the CSRA 

is different from other federal statutes enacted under the aegis

of the Commerce Clause. The difference, he says, is that the

underlying payment obligation the child support order

simpliciter is a creature of state law. This circumstance is

fribbling. South-Eastern Underwriters illustrates that the 

state-law origins of an obligation do not preclude the exercise

of congressional power under the Commerce Clause. The Court

10

there held, 322 U.S. at 546-47, that a fire insurance transaction

across state lines constituted commerce among the several states,

notwithstanding that the insurance policy itself was a personal

contract subject to state law. The same principle obtains here:

although the underlying child support order is a product of state

law, the delinquent parent's location vis- -vis the minor child

creates interstate nexus in the form of an obligation to make

regular payments across state boundaries. Indeed, the CSRA

applies only when the state-imposed child support order develops 

an interstate character, necessitating the sending of money from

one state to another by the obligor. When that occurs, the child

support obligation lies in interstate commerce, subject to

federal regulation, and Congress may act to prevent its

frustration.

The appellant's second argument posits that uncollected

support payments have too tenuous an impact on interstate

commerce to justify the exercise of congressional authority.

This argument relies heavily on Lopez, a case in which the Court 

struck down the Gun-Free School Zones Act (GFSZA), 18 U.S.C. 

922(q)(1)(A), which criminalized the possession of firearms in

local school zones. Holding that Congress exceeded its power

under the Commerce Clause when it enacted the statute, the Court

reasoned that gun possession in a local school zone is not

economic activity of a type that substantially affects interstate

11

commerce. See Lopez, 115 S. Ct. at 1634. Lopez is inapposite 

here.3 The Lopez majority considered only the third, "affecting 

interstate commerce," branch of Commerce Clause authority,

dismissing the first two bases as patently inapplicable. See id. 

at 1630. Here, however, we have no occasion to decide whether

unpaid child support substantially affects interstate commerce;

we instead uphold the CSRA under the second Commerce Clause

category because it regulates things (namely, payment

obligations) in interstate commerce.

There is another, more basic reason why Lopez does not 

assist the appellant's cause. The concerns articulated by the

Lopez Court simply are not implicated by the CSRA. The Lopez 

Court observed that the GFSZA by its terms had no relation to any

sort of economic enterprise, and that neither the statute nor its

legislative history contained express congressional findings

purporting to show the regulated activity's effects on interstate

commerce. See id. at 1630-32. In contrast, the CSRA relates to 

economic transactions, and the enacting Congress made explicit,

well-documented findings regarding the economic effect of unpaid

child support upon interstate commerce. See, e.g., supra Part 

II(A). In the same vein, the Lopez Court made much of the fact
 

3To the extent that the appellant relies on a quartet of
district court decisions purposing to strike down the CSRA on the
authority of Lopez, his reliance is misplaced. Two of them have 
been reversed by the Ninth Circuit. See Mussari, 95 F.3d 787 
(reversing United States v. Mussari, 894 F. Supp. 1360 (D. Ariz. 
1995), and United States v. Schroeder, 894 F. Supp. 360 (D. Ariz. 
1995)). We regard the other two, United States v. Parker, 911 F. 
Supp. 830 (E.D. Pa. 1995), and United States v. Bailey, 902 F. 
Supp. 727 (W.D. Tex. 1995), as infirm.

12

that the GFSZA contained no jurisdictional element to forge a

link between the regulated activity and interstate commerce. See 

Lopez, 115 S. Ct. at 1631. Such an element is conspicuously 

present here, for the CSRA by its terms provides that

jurisdiction will attach only if child support obligations cross

state lines. See 18 U.S.C. 228(a); see also H.R. Rep. No. 102- 

771, supra, at 6 (underscoring that Congress designed the statute 

"to target interstate cases only"). We have found the presence

of such a jurisdictional element to be a powerful argument for

distinguishing Lopez in other cases, see, e.g., United States v. 

DiSanto, 86 F.3d 1238, 1245 (1st Cir. 1996) (upholding federal 

arson statute, 18 U.S.C. 844(i)); United States v. Diaz- 

Martinez, 71 F.3d 946, 953 (1st Cir. 1995) (upholding a federal 

firearms possession statute, 18 U.S.C. 922(k)), and it is

equally potent here.

C. The Tenth Amendment. C. The Tenth Amendment. 

Bongiorno next claims that the CSRA violates the Tenth

Amendment (and, in the bargain, tramples principles of federalism

and comity). This claim hinges on his contention that the CSRA

falls beyond Congress' competence because it concerns domestic

relations (an area traditionally within the states' domain). We

reject the claim out of hand.

The Tenth Amendment declares that "powers not delegated

to the United States by the Constitution, nor prohibited by it to

the States, are reserved to the States respectively, or to the

people." U.S. Const. amend. X. The amendment is not applicable

13

to situations in which Congress properly exercises its authority

under an enumerated constitutional power. See New York v. United 

States, 505 U.S. 144, 156 (1992). Inasmuch as Congress passed 

the CSRA pursuant to the valid exercise of such an enumerated

power (the power to regulate interstate commerce), that tenet

governs here. Accord Hampshire, 95 F.3d at 1004; Mussari, 95 

F.3d at 791.

What is more, a Tenth Amendment attack on a federal

statute cannot succeed without three ingredients: (1) the

statute must regulate the "States as States," (2) it must concern

attributes of state sovereignty, and (3) it must be of such a

nature that compliance with it would impair a state's ability "to

structure integral operations in areas of traditional

governmental functions." Hodel v. Virginia Surface Mining & 

Reclam. Ass'n, Inc., 452 U.S. 264, 287-88 (1981) (internal 

citations and quotation marks omitted). The CSRA passes this

test with flying colors. It does not interfere with state law.

To the contrary, the CSRA comes into play only after a state

court issues a child support order, and it does not authorize a

federal court to revise the underlying decree. Because Congress

succeeded in drafting the CSRA "to strengthen, not to supplant,

State enforcement efforts," 138 Cong. Rec. at H7326 (statement of

Rep. Hyde), the law withstands Tenth Amendment scrutiny.

In this wise, the appellant's analogy to the domestic

relations exception to the federal courts' diversity jurisdiction

is bootless. The CSRA contemplates criminal prosecutions (in

14

which federal jurisdiction runs nationwide, see 18 U.S.C. 3231 

(1994); see also DiSanto, 86 F.3d at 1246), not civil actions; 

and, insofar as civil analogues might be helpful, the existence

of the CSRA itself by analogy supplies an independent basis for

federal jurisdiction because CSRA cases are cases "arising under"

a federal statute, and thus more evocative of 28 U.S.C. 1331

than of 28 U.S.C. 1332.

This leaves only federalism and comity. However, the

appellant's emphasis on these aspirational doctrines cannot tip

the balance. While federalism and comity are matters of

legitimate concern, they are not grounds upon which courts may

declare federal statutes unconstitutional.

D. Additional Constitutional Claims. D. Additional Constitutional Claims. 

On appeal, Bongiorno asserts a gallimaufry of other

constitutional challenges to his conviction, invoking among

others, the Due Process and Equal Protection Clauses, and the

Sixth and Eighth Amendments. Because these challenges are

procedurally defaulted, we dispose of them without ado.

Here, procedural default has two faces. The appellant

failed to raise these miscellaneous constitutional arguments in

the nisi prius court and matters not squarely presented below

generally cannot be advanced on appeal. See United States v. 

Taylor, 54 F.3d 967, 972 (1st Cir. 1995); United States v. Slade, 

980 F.2d 27, 30 (1st Cir. 1992). This raise-or-waive rule

applies full bore to constitutional claims. See Daigle v. Maine 

15

Med. Ctr., Inc., 14 F.3d 684, 688 (1st Cir. 1994). 

To make a bad situation worse, the appellant's briefs

in this court advance these alleged constitutional violations in

vague and cryptic terms. Appellate judges are not clairvoyants,

and it is surpassingly difficult for us to make something out of

nothing. Cf. William Shakespeare, King Lear act 1, sc. 4 (1605). 

We have steadfastly deemed waived issues raised on appeal in a

perfunctory manner, not accompanied by developed argumentation,

see, e.g., Martinez v. Colon, 54 F.3d 980, 990 (1st Cir.), cert. 

denied, 116 S. Ct. 515 (1995); Ruiz v. Gonzalez Caraballo, 929 

F.2d 31, 34 n.3 (1st Cir. 1991); United States v. Zannino, 895 

F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990), and 

this case does not warrant an exception to that salutary

practice. "It is not enough merely to mention a possible

argument in the most skeletal way, leaving the court to do

counsel's work . . . ." Zannino, 895 F.2d at 17. 

For these reasons, we hold that appellant's other

constitutional arguments none of which appear at first blush to

possess discernible merit are procedurally defaulted.4

III. THE LEGALITY OF THE SENTENCE III. THE LEGALITY OF THE SENTENCE

The appellant contends that the "intermittent

confinement" condition of his probation exceeds the maximum term

of imprisonment authorized by the statute of conviction. Because
 

4We have considered all the points, constitutional and
nonconstitutional, to which the appellant alludes in challenging
his conviction. None have the potential to justify relief.
Those that we have not specifically identified are either
unpreserved, or unworthy of discussion, or both.

16

Bongiorno did not raise this contention in the district court, we

review it only for plain error. See United States v. Olano, 507 

U.S. 725, 731-32 (1993); Taylor, 54 F.3d at 972. 

Bongiorno is a first offender who, under the CSRA, can

be imprisoned for no more than six months. See 18 U.S.C.  

228(b)(1). Nevertheless, a sentencing court can impose probation

for up to five years, see 18 U.S.C. 3561(a) & (c)(2) (1994), 

and, as a condition of probation, the court in its discretion may

require a defendant to "remain in the custody of the Bureau of

Prisons during nights, weekends, or other intervals of time,

totaling no more than the lesser of one year or the term of

imprisonment authorized for the offense, during the first year of

the term of probation." 18 U.S.C. 3563(b)(11) (1994).

Invoking this discretionary power, the trial court sentenced

Bongiorno to five years of probation, on condition that he remain

in custody for twelve hours per day during the first twelve

months of the probationary term. Judge Keeton reasoned that if

"the defendant [were] in the custody of the Bureau of Prisons

twelve hours during each night, that total time in a year would

be six months" and therefore would not exceed the statutory

maximum.

On appeal the district court having stayed the

operation of the intermittent confinement condition Bongiorno

faults the judge's reasoning. He bases his argument principally

on the "Schedule of Substitute Punishments" contained in the

17

federal sentencing guidelines.5 But, the sentencing guidelines

do not affect this case; a first offense for a willful failure to

pay child support is a Class B misdemeanor to which the

guidelines do not apply. See U.S.S.G. 2J1.1, comment. (n.2).6 

Moving beyond the guidelines, the appellant's position

is also unsound because it rests on an interpretation of 18

U.S.C. 3563(b)(11) that offends a bedrock maxim of statutory

construction: all words and clauses in a statute are intended to

have meaning and ought to be given effect. See United States 

Dep't of Treasury v. Fabe, 508 U.S. 491, 504 n.6 (1993); United 

States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985). 

To consider only the period of time (one year) for which the

court imposed the condition of probation would ignore the number

of hours the appellant actually will be confined and would

thereby render the statutory allusion to the importance of the

 

5The provision states in pertinent part:

One day of intermittent confinement in prison
or jail for one day of imprisonment (each 24
hours of confinement is credited as one day
of intermittent confinement, provided,
however, that one day shall be credited for 
any calendar day during which the defendant 
is employed in the community and confined 
during all remaining hours); . . . . 

U.S.S.G. 5C1.1(e)(1) (Nov. 1995) (emphasis supplied).

6We note in passing that, even if the guidelines attached,
the intermittent confinement which the district court crafted
probably would not qualify for full-day credit under U.S.S.G.
5C1.1(e)(1) because, while the order requires confinement up to
twelve hours per day, it neither fixes a definite work schedule
nor otherwise requires confinement for "all remaining hours"
apart from time spent at work.

18

total number of hours ("totaling no more than") meaningless. We

will not lightly encroach upon congressional prerogative by

reading words out of a statute, see United States v. Victoria- 

Peguero, 920 F.2d 77, 81 (1st Cir. 1990), cert. denied, 500 U.S. 

932 (1991), and there is no warrant for doing so in this

instance.7

In all events, the appellant did not raise the point

below, and we discern no plain error. The appellant himself

concedes that straight imprisonment for six months would be more

onerous than intermittent confinement for one year. At the same

time, the lower court's work-release arrangement advances the

CSRA's primary objective of encouraging child support payments by

affording the appellant an opportunity to practice his

profession. Given these verities, it is evident that the

sentencing order works no injustice. It follows that the alleged

interpretive error cannot amount to plain error. See Olano, 507 

U.S. at 732; Taylor, 54 F.3d at 973. 

IV. THE GRASP OF THE FEDERAL DEBT COLLECTION PROCEDURE ACT IV. THE GRASP OF THE FEDERAL DEBT COLLECTION PROCEDURE ACT

We turn now to the appeal in the civil case. That case

began when the United States invoked the FDCPA and sought to

 

7The appellant also asseverates that the district court
failed to satisfy the statutory stricture that requires a
district court, among other things, to impose a sentence
sufficient but not greater than necessary to reflect the severity
of the offense, promote respect for the law, and afford adequate
deterrence. See 18 U.S.C. 3553(a)(1)-(2). This asseveration 
is meritless. The sentence artfully balances the appellant's
persistent disregard of child support obligations and the
desirability of deterrence against his need for liberty if he is
to earn the money to which his minor daughter is entitled.

19

compel Bongiorno to pay the arrearage owed as back child support.

The government assumed that since Bongiorno had been ordered to

make restitution of this sum as part of the punishment imposed in

the criminal case, it had access to the FDCPA as a means of

collecting the debt. The district court honored the government's

assumption and granted a writ of garnishment. On appeal,

Bongiorno maintains that the court should have defenestrated the

civil action because a restitution order issued pursuant to the

CSRA is not a "debt" within the meaning of the FDCPA. We agree.

A. The FDCPA. A. The FDCPA. 

Congress enacted the FDCPA as Chapter XXXVI of the

Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4933,

effective May 29, 1991, thus creating a framework under which the

United States might more efficiently collect debts owed to it.

The framework includes procedures that the government can utilize

to recover on, or secure, such debts, and to that extent relieves

the federal sovereign's need to rely on a patchwork of state

laws. See H.R. Rep. No. 101-736, at 23-25 (1990), reprinted in 

1990 U.S.C.C.A.N. 6472, 6631-33; see also Selbe v. United States, 

912 F. Supp. 202, 205 (W.D. Va. 1995).

Congress passed the FDCPA with an end game in mind: to

"lessen[] the effect of delinquent debts on the massive federal

budget deficit now undermining the economic well-being of the

Nation." H.R. Rep. No. 101-736, supra, at 23, 1990 U.S.C.C.A.N. 

at 6631. Consistent with this goal, Congress "defined [`debt']

broadly to include amounts owing to the United States on account

20

of a direct loan or loan insured or guaranteed by the United

States as well as other amounts originally due the United

States." Id. at 28, 1990 U.S.C.C.A.N. at 6636. Notwithstanding 

this breadth of definition, Congress restricted the statute's

grasp to those obligations owing to the federal government. See 

28U.S.C. 3002(3), (15).8 Thislimitation didnot ariseby accident:

The definition of `debt' was carefully
written to make clear that the act will not
apply to obligations which began as purely
private loan or contract obligations. For
example, if one of our constituents goes to
his neighborhood bank or thrift and takes out
a business or personal loan, that transaction
is between him and the bank or thrift. . . .
This is true even if the bank or thrift later
fails and is taken over by Federal
regulators. If the Federal Government seeks
 

8The FDCPA defines "debt" as:

(A) an amount that is owing to the United
States on account of a direct loan, or loan
insured or guaranteed, by the United States;
or
(B) an amount that is owing to the United
States on account of a fee, duty, lease,
rent, service, sale of real or personal
property, overpayment, fine, assessment,
penalty, restitution, damages, interest, tax,
bail bond forfeiture, reimbursement, recovery
of a cost incurred by the United States, or
other source of indebtedness to the United
States, but that is not owing under the terms
of a contract originally entered into by only
persons other than the United States; . . . .

28 U.S.C. 3002(3). In this connection it defines "United
States" as:

(A) a Federal corporation;
(B) an agency, department, commission, board,
or other entity of the United States; or
(C) an instrumentality of the United States.

28 U.S.C. 3002(15).

21

to recover these loan or contract obligations
. . . it is not eligible to use the new
procedures in this act.

136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (statement of

Rep. Brooks).

Mimicking the way in which Congress chose to define the

statute's terms, courts have tended to draw the line between

included and excluded debts depending on whether a particular

debt is owed to the United States in the sense that the debt's

proceeds, if collected, will inure directly to the government's

benefit (in contrast to benefitting a third party). Thus, a fine

which is payable to the government and which, when paid, swells

the public fisc is a debt for purposes of the FDCPA. See 

United States v. Coluccio, 51 F.3d 337, 339 (2d Cir. 1995); 

United States v. Coluccio, 19 F.3d 1115, 1116 (6th Cir. 1994). 

Similarly, federal tax indebtedness which is owed to the

government and which, when collected, is deposited in the

Treasury is a debt for purposes of the FDCPA. See Markham v. 

Fay, 74 F.3d 1347, 1354 (1st Cir. 1996). A promissory note held 

by the Small Business Administration the proceeds of which will

enrich the government's coffers when payment is effected is

also a debt for FDCPA purposes. See United States v. Golden 

Elevator, Inc., 868 F. Supp. 1063, 1066-67 (C.D. Ill. 1994) 

(dictum). By like token, cleanup expenses in environmental cases

which are owed by statute to the government, see 42 U.S.C.  

9607(a)(4)(A) (1994), and which are used to reimburse or defray

monies actually expended by it are considered debts for

22

purposes of the FDCPA. See United States v. Dickerson, 790 F. 

Supp. 1583, 1584-85 (M.D. Ga. 1992). This approach squares

neatly with the statute and its legislative history. The types

and kinds of debts enumerated in section 3002(3) for example,

"a direct loan," an "insured or guaranteed" loan, an amount owing

as an unpaid "fee" or "duty" seem to contemplate payments in

which the government has a direct pecuniary stake. The

legislative history sounds much the same theme. See H.R. Rep. 

No. 101-736, supra, at 23, 1990 U.S.C.C.A.N. at 6631. 

B. The Status of the Debt. B. The Status of the Debt. 

Mindful of the statutory definitions, the legislative

history, and the way in which courts have approached the problem

of determining which debts are within the FDCPA's grasp and which

are not, we conclude that inclusion necessitates an inquiry aimed

at determining to whom the debt is owed and to whose benefit the

proceeds of the debt will inure when it is paid. At the very

least, a debt cannot qualify if both parts of this inquiry point

toward exclusion: a debt cannot be eligible for inclusion under

the FDCPA if the United States is neither the formal owner nor

the direct beneficiary of it. In all events, the debt must clear

an additional hurdle: it must be one that, in the parlance of

the statute, "is not owing under the terms of a contract

originally entered into by only persons other than the United

States." 28 U.S.C. 3002(3).9
 

9In passing the FDCPA, Congress evinced a clear intent to
exclude private transactions debts created under (and thus
governed by) state law, and to which the United States was not an

23

To be sure, the district court made no such inquiry,

but instead allowed the government's application for a writ of

garnishment in a margin order after striking the appellant's

pleadings. Before us, however, the government has not raised any

procedural objections or technical defenses. Rather, it concedes

that it can employ the FDCPA only if the restitution order

constitutes a debt within the meaning of the FDCPA. See 

Appellee's Brief at 9. The parties have briefed and argued this

issue on the merits without reservation, and it is therefore

within our proper province to determine whether the restitution

order that the government seeks to enforce comes within the

penumbra of the FDCPA.

The government's affirmative answer to this question

leans heavily on the majority opinion in NLRB v. E.D.P. Med. 

Computer Sys., Inc., 6 F.3d 951 (2d Cir. 1993). In that case, 

the Second Circuit considered whether a backpay award decreed by

the National Labor Relations Board (NLRB) to remedy an unfair

labor practice constituted a debt to the United States within the

purview of the FDCPA. The panel divided over the issue. The

majority started by holding that the award was a debt due to the

federal government since it had been imposed on the defendant by

a federal agency:
 

original party from the grasp of the FDCPA. See H.R. Rep. No. 
101-736, supra, at 23, 1990 U.S.C.C.A.N. at 6631. In this vein, 
a main proponent of the bill emphasized that to warrant inclusion
the transaction underlying the debt must be one in which the
government was a direct, original participant. See 136 Cong. 
Rec. H13288, supra. The final version of the FDCPA codifies this 
legislative intent.

24

It is precisely because the Board acts
in the public's interest and not those of
private individuals that persuades us that
the backpay award sought by the Board may be
considered a debt to the United States under
the FDCPA. The Board serves as more than a
mere conduit when it initiates an action to
collect a backpay award.

Id. at 955. Having stated this proposition, the majority then 

skimmed over the beneficial ownership aspect, gave great weight

to the fact that without federal intervention the award could not

be collected,10 and ruled that the FDCPA applied. See id. The 

dissenting opinion stressed that the backpay award could not be

considered a debt owed to the United States within the ambit of

the FDCPA because any money collected by the NLRB would flow to

the pockets of the victimized employees and would not directly

benefit the government. See id. at 958 (Walker, J., dissenting). 

Passing the obvious distinction between E.D.P. and this 

case E.D.P. is readily distinguishable because there the NLRB 

was the only entity empowered by law to enforce the backpay

award, see supra note 10, whereas here the debt is enforceable by 

the parties to whom the money, when collected, actually will

flow11 we believe that Judge Walker's dissent provides better
 

10The NLRB imposed the backpay award under the National
Labor Relations Act. See 29 U.S.C. 151-169 (1994). In such 
circumstances, the NLRB is the only entity empowered by law to
enforce the award. See Amalgamated Utility Workers v. 
Consolidated Edison Co., 309 U.S. 261, 264-70 (1940) 
(interpreting 29 U.S.C. 160(a)).

11The appellant's ex-wife and minor daughter have available
mechanisms to enforce the CSRA restitution order, see 18 U.S.C.  
3663(h) (1994) (providing that an order of restitution in a CSRA
case may be enforced either by the United States or "by a victim
named in the order"), as well as the child support order

25

guidance for us than does the majority opinion. While there may

be a somewhat stronger argument for regarding a debt as owing to

the United States if the federal government is the only entity

able to recover it (the E.D.P. scenario), the decision to extend 

the FDCPA to such a situation is a decision properly reserved for

the legislative branch. Because the statute, as written,

contains no language suggesting that all debts subject to

exclusive federal enforcement are included within the grasp of

the FDCPA, we find the position taken by the E.D.P. majority to 

be unsatisfactory.

The force of Judge Walker's opinion is but one of

several factors that influence our judgment. The most important

factor is the language and purpose of the statute itself. Nearly

as telling is a mature but still viable precedent. Forty-five

years ago, the Supreme Court wrestled with a very similar

question under the Bankruptcy Act. See Nathanson v. NLRB, 344 

U.S. 25 (1952). The statutory scheme that the Court pondered

used a concept of public debt that bears a strong family

resemblance to the concept that fuels the FDCPA. It provided

that, with exceptions not relevant here, "debts owing to . . .

the United States" would "have priority, in advance of the

payment of dividends to creditors." 11 U.S.C. 104(a) (West

Supp. 1952) (repealed 1978). The precise question before the

Nathanson Court was whether an NLRB award for backpay was a debt 

owing to the United States (and, thus, entitled to priority in
 

underlying it.

26

bankruptcy). The Court acknowledged that the NLRB was an agent

of the United States and a creditor (being the only party

entitled to enforce the claim), but stated that it did not follow

that the debt was owing to the United States within the meaning

of the Bankruptcy Act. 344 U.S. at 27. Priority in bankruptcy

was intended "to secure an adequate revenue to sustain the public

burthens and discharge the public debts," yet granting priority

in this instance would not further those goals because the

beneficiaries of the claim were private persons. Id. at 27-28 

(citation and internal quotation marks omitted). On this basis,

the Court concluded that the debt was not owed to the United

States in the relevant sense and therefore was not entitled to

the statutory priority. See id. at 28. 

Nathanson bears a close affinity to this case. For one 

thing, the language of the FDCPA parallels that of the bankruptcy

provision discussed in Nathanson. For another thing, the 

legislative purpose underlying the FDCPA is analogous to the

legislative purpose distilled by the Nathanson Court. Congress 

enacted the FDCPA to relieve the strain on the federal deficit

created by persistent nonpayment of debts owed to the United

States. See H.R. Rep. No. 101-736, supra, at 23, 1990 

U.S.C.C.A.N. at 6631. This mirrors the congressional concern

that drove the bankruptcy priority provision which the Nathanson 

Court was called upon to construe. See Nathanson, 344 U.S. at 

27-28. Accordingly, in both the FDCPA and the bankruptcy

milieux, the statutory mechanism does not serve the legislative

27

purpose except when it operates in regard to a debt whose

recovery will directly augment the public coffers. Since the

dynamic in this case tracks the dynamic that was at work in

Nathanson the relation of the government's beneficial interest 

in the debt to the statutory scheme is very much the same 

Nathanson's ratio decidendi controls our deliberations. 

The force of this conclusion is not dissipated merely

because the government secured the restitutionary order. After

all, Nathanson instructs us to look beyond such formalities. See 

id. at 28 (explaining that a court must refuse to treat as an 

included debt "a claim which the United States is collecting for

the benefit of a private party"). In this case, the government

is not the holder of the debt in any legally cognizable sense,

and it seeks to collect restitution not to its own behoof but for

the benefit of a private party (Bongiorno's daughter). Because

the order of restitution here like the backpay award in

Nathanson involves no direct pecuniary interest of the federal 

sovereign, it does not create a debt owing to the United States

within the meaning of the FDCPA.

The government also tries to dodge this bullet by

touting its indirect interest in the award. It tells us that 

public assistance substitutes for most of the $5 billion annual

shortfall in unpaid child support, and that there is thus a

demonstrable public interest in enforcing restitutionary orders

issued in CSRA cases. We agree that this is an area of public

concern, but that is beside the point. A similar sort of "for

28

the general good" argument was made to, and dismissed by, the

Nathanson Court. See id. (rejecting the argument that the 

government's abiding interest in eliminating unfair labor

practices warranted stretching the statute to secure a preference

in payment for backpay awards). The sockdolager, of course, is

that Bongiorno's daughter is not on the welfare rolls. Hence,

the government has failed to show any direct pecuniary interest

of a kind that would render this debt collectible by the United

States under the FDCPA.

The government has one last shot in its sling: the

FDCPA specifically mentions "restitution" among the classes of

included debt, see 28 U.S.C. 3002(3)(B) (quoted supra note 8), 

and the government posits that we need not look beyond this

label. The argument will not wash. The FDCPA does not state

that every order of restitution, no more than every "rent" or 

every type of "reimbursement," constitutes an included debt.

Rather, the text limits the statute's applicability to

restitution that implicates a "source of indebtedness to the 

United States." Id. (emphasis supplied). 

This added language reintroduces the concept of

benefit. Some restitutionary orders create debts that owe

beneficially to the federal government and thus fall within the

purview of the FDCPA. A prototypical case is United States v. 

Gelb, 783 F. Supp. 748 (E.D.N.Y. 1991). Gelb involved 

restitution under the RICO statute. Since that statute declares

that a convicted person must "forfeit to the United States" any

29

ill-gotten gains, see 18 U.S.C. 1963(a) (1994), the federal 

government is the direct beneficiary of the restitution order and

the order thus creates a debt collectible under the FDCPA. See 

Gelb, 783 F. Supp. at 752. But other types of restitution, 

which, when paid, will not increase public revenues (say,

restitution to an individual victim of a crime), do not come

within the statutory encincture. In short, we cannot isolate a

single word "restitution" and conclude that every order

bearing that label automatically falls within the FDCPA's grasp.

The federal government may collect under the FDCPA only

restitution that is "owing to the United States." 28 U.S.C. 

3002(3).

We end where we began. Because restitution ordered

under the CSRA is not owed to the United States in an

economically meaningful sense, the government cannot utilize the

FDCPA as a vehicle for collecting such awards. On this view of

the case, we do not reach the question of whether the debt must

be considered as private in character (and thus ineligible for

inclusion under the FDCPA on that basis) because a state court

order created the underlying child support obligation, and both

the obligor and obligee are private parties.12
 

12We note in passing that a cogent argument can be made for
the proposition that what started as a debt owed by one private
party (Bongiorno) to another (Taylor, on behalf of the couple's
daughter) remains so in its collection, and that the peripheral
involvement of the federal government does not change the
obligation's inherently private character. Indeed, the belated
federal entry into this situation bears a striking resemblance to
the "failed thrift" example that Chairman Brooks used to
illustrate a debt that would be excluded from the FDCPA's grasp. 

30

Because the government sued under an inappropriate

statute, we must reverse the judgment in the civil case. This is

not to say, however, that the appellant can thumb his nose at the

restitution order. Payment of restitution is a condition of his

probation, and the government has adequate remedies if a

convicted defendant flouts a condition of probation. See, e.g., 

18 U.S.C. 3663(g), 3583(e) (1994). The government, moreover,

can attempt to collect the restitution order by resort to other

civil remedies, see 28 U.S.C. 3003(b) (providing that the 

United States retains its authority under laws other than the

FDCPA to collect debts owed to the government); see also Fed. R. 

Civ. P. 64 & 69; see generally Custer v. McCutcheon, 283 U.S. 

514, 516-19 (1931) (discussing application of various state

statutes to executions on judgments recovered by the United

States), and, as mentioned earlier, Bongiorno's ex-wife and

daughter have ample recourse, see supra note 11. But to allow 

the federal government to proceed under the FDCPA for no more

persuasive reason than that collecting the debt serves the public

interest would cavalierly consign Nathanson to the scrap heap 

and, in the bargain, expand the FDCPA's scope without limitation.

We are not at liberty to chart so free-wheeling a course.

V. EPILOGUE V. EPILOGUE

We need go no further. To recapitulate, we discern

neither a constitutional flaw in the fabric of the Child Support

Recovery Act nor any other reversible error marring the
 

See 136 Cong. Rec. H13288 (quoted supra p. 21). 

31

appellant's conviction and sentence. We therefore affirm the

judgment in the criminal case. The civil case, however, yields a

diametrically opposite outcome. Because the federal government

does not have a direct pecuniary interest in the avails of the

restitutionary order, we hold that the order is not a debt owing

to the United States subject to collection under the FDCPA.13

The government's ancillary civil action ought therefore to have

been dismissed.

Affirmed in part and reversed in part. The cases are remanded to Affirmed in part and reversed in part. The cases are remanded to 

the district court for further proceedings consistent with this the district court for further proceedings consistent with this 

opinion. No costs. opinion. No costs. 

 

13Given this holding, we need not address the appellant's
claim that the district court improperly struck his pleadings for
failure to comply with local rules governing appearances by out-
of-state counsel.

32