**UNITED STATES of America, Appellee,**

v.

**Samuel D. SAGE, Defendant–Appellant.**

**No. 1681, Docket 96–1001.**

United States Court of Appeals,
Second Circuit.

Argued May 31, 1996.

Decided Aug. 12, 1996.

---

102

Terence S. Ward, Assistant Federal Public Defender (Thomas G. Dennis, Federal Public Defender, Hartford, Conn.), for defendant-appellant.

Christopher F. Droney, United States Attorney, District of Connecticut, New Haven, Conn. (Denise Derby, on the brief), for the United States.

Before VAN GRAAFEILAND and LEVAL, Circuit Judges, and NICKERSON,* District Judge.

---

* Honorable Eugene H. Nickerson, of the United States District Court for the Eastern District of New York, sitting by designation.

NICKERSON, District Judge:

This appeal raises the question whether the Child Support Recovery Act of 1992 (the Act), 18 U.S.C. § 228 (1994), is invalid as beyond the constitutional power of Congress to enact.

On July 13, 1995, an information filed in the United States District Court for the District of Connecticut charged that defendant-appellant Samuel D. Sage, residing in a State outside Connecticut, willfully failed to make support payments previously ordered by a Connecticut court for his two minor children resident in Connecticut, and that the amount due, more than $5000, had been unpaid for more than a year.

Judge Squatrito denied a motion to dismiss in which Sage argued that the Act was unconstitutional. On October 6, 1995, Sage entered a plea of guilty conditioned on his right to appeal the court's ruling. On appeal he says that Congress had no power under the Commerce Clause to adopt the Act and that it is also invalid under the Tenth Amendment.

In addition to the court below, two other District Courts in this Circuit have upheld the Act. *United States v. Nichols*, 928 F.Supp. 302 (S.D.N.Y.1996) (Preska, J.); *United States v. Collins*, 921 F.Supp. 1028 (W.D.N.Y.1996) (Foschio, M.J.).

So have eight District Courts in other Circuits. *United States v. Kegel*, 916 F.Supp. 1233 (M.D.Fla.1996); *United States v. Sims*, 936 F.Supp. 817 (N.D.Ok.1996); *United States v. Wilson*, No. 4:95–MG–3026 (N.D.Ohio Nov. 8, 1995) (slip op.); *United States v. Hopper*, 899 F.Supp. 389 (S.D.Ind. 1995); *United States v. Murphy*, 893 F.Supp. 614 (W.D.Va.1995); *United States v. Hampshire*, 892 F.Supp. 1327 (D.Kan.1995). Three District Courts have struck down the Act. *United States v. Parker*, 911 F.Supp. 830 (E.D.Pa.1995); *United States v. Bailey*, 902 F.Supp. 727 (W.D.Tex.1995); *United States v. Schroeder*, 894 F.Supp. 360 (D.Ariz.1995), *recon. denied*, 912 F.Supp. 1240; *United*

*States v. Mussari,* 894 F.Supp. 1360 (D.Ariz. 1995) (companion case to *Schroeder*), *recon. denied,* 912 F.Supp. 1248.

## THE FACTS

On May 15, 1985, a Massachusetts court dissolved the marriage of Samuel Sage and his wife, Julie, and ordered Sage to pay $70 a week and unreimbursed medical expenses for the support of their two children, Samuel and Sharril Sage. Sage made no payments, so Julie filed with the court a petition for contempt. When Sage failed to appear, the court issued process for his arrest, but he was not found. Thereafter, Julie and the children moved to Connecticut.

In August 1986 Julie filed a petition with the Support Enforcement Unit of the Connecticut Judicial Branch under the Uniform Reciprocal Enforcement of Support Act (the Uniform law), 9B U.L.A. 553 (1958). In accordance with the provisions of the Uniform law as adopted by Connecticut, Conn. Gen. Stat. Ann. §§ 46b–180 to 46b–211 (West 1995), the Connecticut court found that Sage owed the duty of support decreed by Massachusetts and ordered him to pay, forwarding the petition to Detroit, Michigan, where Julie believed Sage was residing. The Michigan court in turn found the same such duty and ordered Sage to make payments for it to send on to the Connecticut court. In response to this order Sage made some sporadic payments in 1991 but none after September of that year.

Undaunted, Julie filed in December 1991 another petition in the Connecticut court under the Uniform law, this time forwarded to Ohio. The Ohio court made the same finding as had the others and ordered Sage to make the requisite payments to it for transfer to Connecticut. Once again Sage made a few paltry payments but soon ceased to do so, and moved to Alabama, then to Mississippi, and finally back to Ohio.

From September 1991 on, Sage had the ability to pay but willfully did not. As of the date of the plea he owed more than $41,000 in support payments and unreimbursed medical expenses.

More than ten years after the entry of the Massachusetts judgment, Sage pleaded guilty to the information. Judge Squatrito imposed a sentence of five years probation, with conditions requiring Sage to maintain full time employment, to make restitution of $41,323.10 in installments, and to pay support in the amounts originally ordered by the Massachusetts court. The judge denied Sage's motion to dismiss the information, holding, among other things, that the Act was a valid exercise of Congress's power because it regulated an activity that substantially affects interstate commerce.

On appeal Sage argues that Congress in adopting the Act exceeded the scope of the Commerce Clause by attempting to regulate an activity that was not "commercial" and that did not "substantially affect" interstate commerce. He also contends that the Act is invalid under the Tenth Amendment as an infringement on the States' rights to govern domestic relations.

## THE ACT

The Act makes it a crime for a person "willfully" to "fail[ ] to pay a past due support obligation with respect to a child who resides in another State." 18 U.S.C. § 228(a) (1994). Subsection (d) defines that obligation to mean any amount that a State order has "determined" to be "due" for "support and maintenance of a child or of a child and the parent with whom the child is living," provided the amount has been unpaid for longer than a year or exceeds $5000. For a first offense subsection (b) fixes the maximum punishment at six months imprisonment and a fine, and for subsequent offenses at two years and a fine. Upon a conviction the court must, under subsection (c), order restitution in the amount equal to the "past due support obligation" unpaid at the time of sentence.

## THE GENESIS OF THE ACT

Passage of the bill that became the Act was not the result of some sudden whimsy of 1992. Congressman Henry Hyde, the chief sponsor of the measure, had offered similar legislation in the past. For some years he had been concerned "by those thousands and

thousands of delinquent parents who make a mockery of State law by fleeing across State lines to avoid enforcement actions by State courts and child support agencies." 138 Cong. Rec. H7324, H7326 (daily ed. Aug. 4, 1992) (statement of Cong. Hyde). In support of the bill he said that "[t]oo often as soon as delinquent fathers move to new States, they seem to vanish as far as State enforcement agencies are concerned" because the State "mechanisms lose their effectiveness." He assured the House that the bill's goal was "to strengthen, not to supplant, State enforcement." *Id.*

The House Committee on the Judiciary reported that in the United States in 1989 some $5 billion of the $16 billion in child support obligations went unpaid. H.R.Rep. No. 771, 102d Cong., 2d Sess. 5 (1992). Although this amount evidenced a widespread problem in the United States, the bill sought to affect only that fraction that was indisputably interstate, namely, those instances where the delinquent parent and the children lived in different States. *Id.* at 6.

Congress did not regard it a trivial matter that so many parents seeking to evade State court orders deliberately took advantage of our system of separate States. Of the $5 billion in unpaid support, one-third involved a father living apart from his children in another State. *Id.* at 5. More than half of the custodial parents in interstate cases received support payments only occasionally, seldom, or never. *Id.*

Congress recognized that the States had not been indifferent to the plight of children in such cases. The States have made willful failure to pay child support a crime and have adopted the Uniform law providing for enforcement across State lines. But that law's complex and cumbersome procedures have made it largely ineffective. *Id.* at 6. The House heard of "instance after instance where spouses, usually husbands, did not want to pay, went to another State, waited just until the legal process was able to catch up with [them], and then went to another State and started the procedure all over again." 138 Cong. Rec. at H7325 (statement of Cong. Schumer).

State officials reported to Congress that support orders in interstate cases remain the most difficult to enforce and that extradition procedures under the Uniform law "have utterly failed to bring to justice" the delinquent parents. H.R.Rep. No. 771 at 6.

Mindful of the increasing poverty rate of families with children and an absent parent, and of the concomitant effect on the amounts required to supply public assistance, *id.* at 5, Congress adopted the bill to supplement State enforcement of an absent parent's obligation. President Bush signed the measure on October 25, 1992.

### THE COMMERCE CLAUSE

Section 8 of Article I of the Constitution of the United States provides that "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

A consideration of the scope of the Commerce Clause appropriately starts with Chief Justice John Marshall's 1824 opinion in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). In that case Thomas Gibbons had two steamboats that plied the waters between New Jersey and New York. Aaron Ogden was the assignee of an exclusive franchise granted by the New York State legislature to Robert R. Livingston and Robert Fulton to use boats moved by fire or steam in New York waters. Ogden obtained an injunction from the New York courts restraining Gibbons' use of steamboats in these waters. Gibbons appealed to the Supreme Court, arguing that the New York law was repugnant to the Commerce Clause.

Chief Justice Marshall focused first on the meaning of the word "Commerce." Counsel for Ogden had contended that commerce was limited "to traffic, to buying and selling, or the interchange of commodities." *Id.* at 189. The Chief Justice rejected this, saying: "This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing

rules for carrying on that intercourse." *Id.* at 189–90.

Chief Justice Marshall defined the term "among" to mean "intermingled with," so that the clause granted Congress power to regulate, that is, to prescribe "the rule" for, "commerce which concerns more States than one." *Id.* at 194. The Commerce "power," he explained, "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Id.* at 196.

■ This case involves matters that plainly meet John Marshall's definition of commerce among the several States. The Act presupposes intercourse, an obligation to pay money, and the intercourse concerns more States than one.

All of the State courts that dealt with Sage were unable to make him fulfill his obligation. Connecticut, which made the Massachusetts order its own, twice resorted to the Uniform law but met with minuscule success as Sage moved from State to State. The Massachusetts order was unrestricted. Sage concedes that it required him to pay support without regard to where he resided. The Connecticut court entered an identical order. By requiring Sage to support his children irrespective of his State of residence, the courts imposed on him an obligation to make payments across State lines when he resided in Michigan, Ohio, Alabama, and Mississippi.

The fact that, because of the nature of our Federal system, Connecticut was unable effectively to enforce that obligation does not mean that it did not exist or had somehow vanished. All the Act does is enable the United States to help Connecticut do what it could not do on its own, namely, enforce Sage's obligation to send money from one State to another. Congress was not impotent to overcome the obstacles inherent in our Federal system to the enforcement of that obligation.

As the Supreme Court said in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 552, 64 S.Ct. 1162, 1173, 88 L.Ed. 1440 (1944), the power granted Congress by the Commerce Clause is "a positive power," a power "to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing."

Exercising that positive power Congress has often passed legislation to help the States solve problems that defy local solution. *See, e.g., Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971) (legislative history of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq., indicated that loansharking " 'simply cannot be solved by the states alone' "); *United States v. Sheridan,* 329 U.S. 379, 384, 67 S.Ct. 332, 335, 91 L.Ed. 359 (1946) (in adopting the National Stolen Property Act, 18 U.S.C. § 2314, Congress "contemplated coming to the aid of the states in detecting and punishing criminals" who "make a successful get away and thus make the state's detecting and punitive processes impotent"); *United States v. Bishop,* 66 F.3d 569, 579 (3rd Cir.) (Congress found in considering the Anti Car Theft Act of 1992, 18 U.S.C. § 2119, that "significant barriers to [state and local] enforcement" had resulted in thieves escaping punishment), *cert. denied,* —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995).

Sage argues that the Act is not within the Commerce Clause power and thus invalid on its face because it concerns not the sending of money interstate but the failure to send money.

Such reasoning would mean that Congress would have no power to prohibit a monopoly so complete as to thwart all other interstate commerce in a line of trade. Yet the Sherman Act, 15 U.S.C. §§ 1, 2, is within the Commerce Clause power. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). To accept Sage's reasoning would disable the United States from punishing under the Hobbs Act, 18 U.S.C. § 1951, making it a crime to "obstruct" interstate commerce, someone who successfully prevented interstate trade by extortion and murder. There would be no trade to obstruct.

If Congress can take measures under the Commerce Clause to foster potential interstate commerce, it surely has power to prevent the frustration of an obligation to en-

gage in commerce. The Supreme Court has so held.

A good example is *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239 (1921). There the defendant, a farmer in Kentucky, breached a contract with the plaintiff Tennessee corporation and refused to deliver wheat. Plaintiff sued in Kentucky claiming defendant had an obligation to pay damages. The defendant argued that the contract was unenforceable because plaintiff had not complied with a Kentucky statute prescribing conditions on which out-of-State corporations might do business in the State. The Supreme Court held that the contract constituted a transaction "in commerce," and that the Commerce Clause itself barred Kentucky from preventing enforcement of the contract to send goods or pay damages. *Id.*, 257 U.S. at 292, 42 S.Ct. at 109; *see also Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 33, 95 S.Ct. 260, 267, 42 L.Ed.2d 195 (1974) (transactions "indistinguishable" from those in *Dahnke–Walker*); *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 515, 43 S.Ct. 643, 646, 67 L.Ed. 1095 (1923) ("contracts" for interstate sales are "interstate commerce in its essence").

In the present case the obligation stems from a court order, not a contract, but the principle is the same. Of course, sending money to another State is commerce although the transaction does not "concern the flow of anything more tangible than electrons and information." *South–Eastern Underwriters Ass'n*, 322 U.S. at 550, 64 S.Ct. at 1172.

Sage also contends that the Act is beyond Congress's power because it might apply to a case where the parent is obligated to make wholly intrastate payments. He posits the following hypothetical. Assume, he says, that the child and parents after a divorce all live in the same State until the child turns 18 and moves to another State. The father, who has never made the court ordered payments, has no further obligation to support his child, who has attained a majority. But the father owes his ex-wife, as the former custodial parent, for the arrears. Sage says that the father could be prosecuted under the Act, though he is obligated to make solely intrastate payments, and that such an application of the Act would be unconstitutional.

■ It seems unlikely in the extreme that the United States would invoke the Act where the State could enforce its own order. But in any event this court need not determine whether the Act would apply in such a presumably unusual situation or whether if it did the transaction would be within Congress' Commerce power to regulate. In order to succeed in a facial challenge to the Act, Sage must show that " 'no set of circumstances exists under which the [Act] would be valid.' " *Giusto v. I.N.S.*, 9 F.3d 8, 10 (2d Cir.1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)). As this court said in *General Electric v. New York State Dept. of Labor*, 936 F.2d 1448, 1456 (2d Cir.1991), "[t]he fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since the [Supreme] Court has not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."

We therefore need not address Sage's claim that the Act might be invalid in one highly improbable scenario.

Sage argues that the decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), requires this court to strike down the Act. We reject the argument. That case concerned legislation making it a federal crime for a person to possess a gun in a place the person knows or reasonably believes to be a school zone.

The majority opinion in *Lopez* referred to three categories of activity that the Supreme Court had identified as subject to regulation under the Commerce Clause. Congress may (1) regulate the use of the channels of commerce; (2) regulate and protect the instrumentalities of, or persons or things in, interstate commerce; and (3) regulate activities having a substantial relation to interstate commerce. —— U.S. at —— – ——, 115 S.Ct. at 1629–30. The decision turned on whether the legislation, on its face regulating purely local activity, was within the Commerce Clause power on the theory that the

activity "substantially affected" interstate commerce. *Id.* at ——, 115 S.Ct. at 1630.

The Act does not purport to regulate purely local activity. It addresses an obligation to make payments in interstate commerce. It is true, as Sage points out, that no payments are "in" interstate commerce when a prosecution is commenced. But the transaction the parent is obligated to consummate is, for the reasons stated above, in interstate commerce. Thus the Act may fairly be considered a proper exercise of Congress's power under the second category because it regulates the flow of payments on unfulfilled child support orders where the child and obligated parent reside in separate States. We need not reach the question whether the Act may be upheld under the other two categories.

None of the concerns expressed in the *Lopez* opinion is at stake in this case.

To sustain the Act does not require a court to espouse reasoning that would enable Congress to regulate any activities that might lead to crime "regardless of how tenuously they relate to interstate commerce," —— U.S. at ——, 115 S.Ct. at 1632, or any activities Congress found to be related to the "economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example," *id.* As already stated, by its terms the Act provides a multistate jurisdictional element. *Cf. id.* at ——, 115 S.Ct. at 1631. Because it presupposes an order of a State court imposing an obligation to pay money, the Act concerns transactions related to economic activity. *Cf. id.*

Moreover, nothing about the Act threatens the existence or significance of the States or interferes with the exercise of their powers. *Cf. id.* at ——, 115 S.Ct. at 1634. On the contrary the Act aims to help the States in their efforts, often unsuccessful, to enforce their child support decrees.

## THE TENTH AMENDMENT

The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Sage argues that the Act contravenes the Tenth Amendment because it "invades areas of legislation historically reserved to the States," namely, "the protection of family relations." This argument does not have the faintest merit.

■ As noted above, the Act does not attempt to regulate domestic relations. The legal relationship within the Sage family was initially determined by a Massachusetts court, and that determination was expressed in a judgment adopted by several other State courts, a judgment the States were unable to enforce due to Sage's frequent moves. The Act does not authorize a federal court to revise the domestic relationship adjudicated by the State courts or to modify any part of a State court decree.

This is not a case where federal legislation has commanded a State to provide benefits for a child, *cf. New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (Congress may not direct States to provide for the disposal of radioactive waste), or compelled a State to enact and enforce a federal family program. *Cf. Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981) (federal mining legislation upheld because it did not "commandeer" the States to regulate mining).

The Act accepts the validity of the State court judgment and the family policies that judgment embodies. It seeks merely to implement those State policies when the parent and the child live in different States and the judgment has been willfully flouted.

The Tenth Amendment did not disable the United States from helping the States to enforce State court orders imposing obligations to make support payments interstate.

No doubt, as Justice Kennedy said in his concurring opinion in *Lopez,* the Framers of the Constitution believed that "freedom was enhanced by the creation of two governments, not one." —— U.S. at ——, 115 S.Ct. at 1638. The only freedom that would be enhanced by striking down the Act would be the freedom of Sage and those like him to evade their State obligations to support their children residing in a different State.

*CONCLUSION*

The court holds that the Act is within the power of Congress to adopt. The judgment of the District Court is affirmed.