**UNITED STATES of America,
Appellant,**

v.

**Eric KING, Defendant–Appellee.**

**Docket No. 01–1141.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 10, 2001.

Decided Jan. 2, 2002.

William C. Silverman, Assistant United States Attorney, for Mary Jo White, United States Attorney for the Southern District of New York (Peter G. Nieman, on the brief), for Appellant.

Richard A. Greenberg, Newman & Greenberg, New York, NY, (Karl E. Pflanz, on the brief, Kenneth E. Warner, Coblence & Warner, New York, NY, of counsel) for Defendant–Appellee.

Before: CARDAMONE, · McLAUGHLIN, and POOLER, Circuit Judges.

## BACKGROUND

McLAUGHLIN, Circuit Judge.

Eric King was charged with one misdemeanor count and one felony count of willful failure to make child support payments for his child who lives in another state, in violation of the Child Support Recovery Act of 1992, as amended by the Deadbeat Parents Punishment Act of 1998 (collectively, the "CSRA"), 18 U.S.C. §§ 228(a)(1), (a)(3).

The indictment alleged specifically that for a period of eight years King had failed to make court-ordered child support payments of approximately $3,000 a month, creating a debt of over $300,000. Throughout this period, King's child and her mother, Ana Carril, resided in New York, while King resided in Texas.

Before King's arrest, his civil counsel negotiated a settlement with the Attorney General of Texas, who was acting on behalf of the New York Commissioner of Social Services pursuant to an interstate compact for child support enforcement. Under this settlement, King agreed to repay the City of New York for all welfare payments from the public fisc to Carril during the period of non-support, and to pay approximately $100,000 to Ana Carril. In return, all judgments, warrants and garnishments against King were vacated. Holding King's feet to the fire, the government maintained that King's civil settlement had no bearing whatever on his criminal liability under the CSRA. The government thus brought its superseding indictment and moved forward with King's prosecution.

King moved pursuant to Fed.R.Crim.P. 12 to dismiss the indictment on the ground that, on its face, the CSRA exceeded Congress' legislative authority under the Commerce Clause to regulate commerce among the states. U.S. Const. art. I., § 8, cl. 3. Acknowledging that this Court had earlier rejected this very same challenge to the CSRA (albeit before its amendment by the Deadbeat Parents Punishment Act of 1998), *United States v. Sage,* 92 F.3d 101 (2d Cir.1996), King contended that *Sage,* while it had not been explicitly overruled, was nevertheless no longer good law after the Supreme Court's most recent pronouncement on the limits of Congressional authority under the Commerce Clause in *United States v. Morrison,* 529 U.S. 598,

120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that the civil remedy provisions of the Violence Against Women Act exceeded Congressional authority under the Commerce Clause). The government countered that nothing in *Morrison* undermined the central holding of *Sage*—that the child support debt is a "thing in interstate commerce" and thus is a valid subject of Commerce Clause regulation.

The United States District Court for the Southern District of New York (Sweet, *J.*), relying extensively on a Sixth Circuit panel decision in *United States v. Faasse*, 227 F.3d 660, *reh'g en banc granted, opinion vacated by* 234 F.3d 312 (6th Cir.2000), *and rev'd*, 265 F.3d 475 (6th Cir.2001) (*en banc*), agreed with King, writing, "in light of the Supreme Court's recent jurisprudence, the *Sage* holding is in doubt." *United States v.. King*, No. S1 00 CR. 653, 2001 WL 111278, *5 (S.D.N.Y. Feb.8, 2001). The district court concluded that the CSRA is unconstitutional and dismissed the indictment against King. *Id.* at *6–7. The United States now appeals.

## DISCUSSION

■ The district court's dismissal of the indictment raises questions of constitutional interpretation, and thus we review the district court's decision *de novo*. *United States v. Moskowitz*, 215 F.3d 265, 268 (2d Cir.2000).

■ Among the eighteen Congressional powers enumerated in Article I of the Constitution, the Commerce Power is, perhaps, the most sweeping. The Commerce Clause authorizes Congress "To regulate Commerce with foreign Nations, and among the several States. . . ." U.S. Const. art. I, § 8, cl. 3. While this grant of authority is undeniably broad, in recent years, the Supreme Court has moved decisively to breathe vitality into the notion that "Congress' regulatory authority is not without effective bounds." *Morrison*, 529 U.S. at 608, 120 S.Ct. 1740 (citing *United States v. Lopez*, 514 U.S. 549, 557, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)).

■ In *Lopez*, the Supreme Court outlined three broad areas that Congress could permissibly regulate under the Commerce Clause: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624 (citations omitted).

■ The CSRA makes it a federal crime to willfully fail to pay a child support obligation imposed by a court order or order of an administrative process, but only when the defendant and the child reside in different states. 18 U.S.C. §§ 228(a)(3), (c)(2), (f)(3).

■ Called upon to determine the constitutionality of the CSRA under the new *Lopez* framework, we concluded, in *Sage*, that the CSRA regulates a thing in interstate commerce—to wit, "the flow of payments on unfulfilled child support orders" across state lines—and thus falls within the second of *Lopez*'s three categories of permissible objects of Commerce Clause regulation. 92 F.3d at 107. Sage had argued that the CSRA did not regulate "a thing in interstate commerce" because the CSRA concerned "not the sending of money interstate but the failure to send money." *Id.* at 105. We noted that the Supreme Court had previously struck down, on Commerce Clause grounds, state laws that frustrated contractual obligations to engage in interstate commerce. *Id.* at 105–06 (citing *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239 (1921)). From there, we

reasoned that there was no constitutionally significant difference between a contractual obligation to send goods interstate and a court-ordered obligation to send money interstate. *Id.* at 106. Thus we held that Congress could regulate and criminalize conduct that frustrated fulfillment of those obligations pursuant to its power to regulate things in interstate commerce. *Id.* at 106–07 (citing *Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624).

■ It is, of course, axiomatic that "we 'will not overrule a prior decision of a panel of this Court absent a change in the law by higher authority or by way of an in banc proceeding of this Court.'" *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 149 (2d Cir.2001) (quoting *Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.1993)). Accordingly, we are required to abide by the holding of *Sage* unless the Supreme Court has changed the law upon which that holding was based.

King contends that *Morrison, supra,* requires us to abandon the holding in *Sage,* that an obligation to pay money across state lines is a thing in interstate commerce and that, therefore, Congress can regulate conduct that obstructs that commerce. We believe that *Morrison* effected no such change in the Commerce Clause landscape.

*Morrison* struck down certain civil remedies provided in the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981. *Morrison,* 529 U.S. at 627, 120 S.Ct. 1740. VAWA had provided that any victim of gender-motivated violence could sue the attacker for damages in federal court. 42 U.S.C. § 13981. Pointing to stacks of Congressional findings, VAWA's defenders demonstrated that, in the aggregate, gender-motivated violence had an enormous effect on interstate commerce. Thus, they argued that the contested civil remedies were encompassed by *Lopez*'s third category of objects of permissible Commerce Clause regulation: "activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624. The Supreme Court, in *Morrison,* disagreed, holding that gender-motivated violence, a fundamentally intrastate and non-economic activity, did not substantially affect interstate commerce. 529 U.S. at 617–18, 120 S.Ct. 1740.

The district court below concluded that *Morrison* effectively abrogated *Sage:* "Thus, the holding in *Morrison* clarified that Congress may regulate conduct that obstructs interstate commerce through the Commerce Clause only where that conduct has a 'substantial effect' on such commerce—i.e., under the third prong of *Lopez.*" *King,* 2001 WL 111278 at *4. It would appear that, under the district court's reading of *Morrison,* Congress cannot regulate activity that obstructs either channels of interstate commerce, or instrumentalities of and persons and things in interstate commerce—the first and second categories of the *Lopez* framework—unless the regulated commerce-obstructing activity independently satisfies *Lopez*'s third prong—substantially affecting commerce—as well.

We reject this expansive reading of *Morrison.* It is not insignificant that the district court did not cite *Morrison* to support its broad proposition, but rather relied exclusively on the already-vacated, later-reversed panel decision of the Sixth Circuit. *See King,* 2001 WL 111278 at *4–5 (citing *Faasse,* 227 F.3d at 669). *Morrison* addressed only the third *Lopez* category: activities that substantially affect interstate commerce. *See Morrison,* 529 U.S. at 609, 120 S.Ct. 1740 ("Petitioners do not contend that these cases fall within either of the first two of these categories of Commerce Clause regulation. They

seek to sustain [VAWA] as a regulation of activity that substantially affects interstate commerce.... [W]e agree that this is the proper inquiry.").

The *Morrison* Court was not called upon to consider whether obstructions of interstate commerce might also have been regulated under the first or second *Lopez* categories. Nor can it be reasonably inferred from the Supreme Court's discussions concerning the third "substantial effects" category that regulations of obstructions of interstate commerce must be limited to that category. In short, *Morrison* did not in any way alter the *Lopez* tripartite framework or otherwise refine the analysis of when something qualifies as a "thing in interstate commerce" and thus may be permissibly regulated under *Lopez*'s second category.

That reality is fatal to King's argument before us. Nothing in *Morrison,* or any other Supreme Court case, undermines this Court's prior conclusion in *Sage* that the obligation to pay money across state lines is a thing in interstate commerce, and that the failure to meet such an obligation can be regulated and criminalized under the second *Lopez* category. We are, therefore, bound by *Sage*'s holding that the CSRA is a permissible exercise of Congressional authority under the Commerce Clause.

## CONCLUSION

For the foregoing reasons, we RE-VERSE the decision of the district court and REMAND the case for further proceedings not inconsistent with this opinion.