

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-6-2007

# USA v. Kukafka

Precedential or Non-Precedential: Precedential

Docket No. 05-1955

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Kukafka" (2007). *2007 Decisions.* Paper 1396.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1396

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1955

———


UNITED STATES OF AMERICA

v.

IRA KUKAFKA,

Appellant

———


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 04-cr-00282)
District Judge: Honorable Anne E. Thompson

———



Submitted pursuant to Third Circuit LAR 34.1(a)
December 13, 2006


Before: FUENTES and VAN ANTWERPEN,[*] Circuit Judges,
and PADOVA,[**] District Judge.

———

[*] Judge Van Antwerpen assumed senior status on October 23, 2006.

[**] The Honorable John R. Padova, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

(Filed: March 6, 2007)

George S. Leone
Sabrina G. Comizzoli
Mark E. Coyne
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

     Attorneys for Appellee

David E. Schafer
Office of the Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ 08609

     Attorney for Appellant

———

OPINION OF THE COURT

———

FUENTES, Circuit Judge.

In 1996, after fourteen years of marriage, Ira Kukafka abandoned his wife and four children in New Jersey and fled to Florida where he shared an apartment with his mother. Eight years later, owing over $125,000 in outstanding child support, Kukafka was indicted by a New Jersey Grand Jury for willful failure to pay his support obligation in violation of the federal Child Support Recovery Act, 18 U.S.C. § 228. Kukafka was convicted and sentenced to two years in prison and $145,337 in restitution. On appeal, Kukafka's primary challenge is that, following the Supreme Court's decision in United States v. Morrison, 529 U.S. 598 (2000), the Child Support Recovery Act exceeds Congress's power under the Commerce Clause. He also contends that a provision in

his divorce judgment requiring him to obtain an ecclesiastical divorce violates the Free Exercise Clause of the First Amendment. Further, he claims that the District Court's jury instruction on willfulness improperly stated the government's burden of proof. We reject these contentions and will affirm the judgment of conviction.

## I. Background

Ira Kukafka is a trained electrical engineer, with an undergraduate degree from the City University of New York and a Master's degree from Fairleigh Dickinson University. He also has several credits toward a PhD at the New Jersey Institute of Technology. During the 1970's and 1980's, Kukafka worked as an engineer for AT&T and then for the United States Army. In 1982, he married Esther Bailey and moved to a house in Oakhurst, New Jersey. The couple have four children.

In 1984, Kukafka left engineering to go into the real estate business with his father-in-law, Harry Bailey. After ten years, and facing increasing financial difficulty, the partnership dissolved because of a bad real estate venture. The bank foreclosed on Kukafka's house, which had been used as collateral for part of the deal, forcing him and his family to move in with his in-laws. Over the next two years, financial difficulties and family pressures led to problems in Kukafka's marriage. He worked only intermittently, and two of his children were diagnosed with serious illnesses—one with retinal blastoma resulting in the loss of an eye, and the other with a congenital stomach disorder and a severe developmental disability. In mid-1996, after a fight with his father-in-law, Kukafka left his family to stay with his sister in New York. Soon thereafter he moved to Florida and, from that time forward, had only sporadic contact with his children.

In 1997, Esther Bailey commenced divorce proceedings against her husband. Kukafka did not contest the divorce and the Superior Court of New Jersey entered a default Judgment of Divorce ("Divorce Decree"). Among other things, the Divorce Decree required Kukafka to pay $400 per week in child support, $350 per week in alimony, for an ecclesiastical divorce, and to

maintain health insurance for his children.

From 1998 to 2004, Kukafka consistently failed to make child support payments. He made no payments in 2004, the year this action was commenced. During the period he was in default, Kukafka was living with his mother and had no rent or basic living expenses. Although he applied for various positions, his only employment was one week of work in December 2000, for which he earned about $2,900. Kukafka also earned sporadic income from an assortment of odd jobs, such as providing driving service to the elderly. Around this time, Kukafka was also diagnosed with depression and diabetes.

By August 2004, Kukafka had paid only $1,657 in child support and owed $127,343 in outstanding payments. Except for $157 in 2001, every payment Kukafka made was pursuant to court order following contempt proceedings in Florida.[1] These payments were the minimum amount needed to avoid being sent to jail for ninety days. During the contempt proceedings, Kukafka claimed, among other things: that he should not have to pay child support; that his ex-wife earned enough on her own to support their children; that he was unable to obtain suitable employment; that he was awaiting returns on several real estate ventures; that he was pursuing needed licensing and education; and that his illnesses prevented him from finding work. He was repeatedly admonished to make efforts to find work and to pay the $400 per week obligation.

Ultimately, a grand jury indicted Kukafka on two counts of knowing failure to pay child support. Count I charged Kukafka

---

[1] In 1997, Esther Bailey began receiving welfare checks in exchange for assigning her support collection rights to the State. After she made this assignment, New Jersey requested that Florida enforce Kukafka's child support obligation and seek collection from Kukafka. Under the Uniform Reciprocal Enforcement of Support Act ("URESA"), and the more recent Uniform Interstate Family Support Act ("UIFSA"), Florida agreed to enforce the child support obligation.

with willful failure to make support payments from December 1997 until June 23, 1998 in violation of 18 U.S.C. § 228(a)(1). Count II charged him with willful failure to provide support from June 24, 1998 until August 20, 2004 in violation of 18 U.S.C. § 228(a)(3). After a two-week trial, a jury found Kukafka guilty of both counts and made a supplementary finding that he had violated one or more specific court orders. The District Court sentenced him to two years in prison, one year of supervised release, $145,337 in restitution, and a $200 special assessment. This appeal followed. We have carefully reviewed the numerous issues Kukafka raises. Of these, the four relating to the Child Support Recovery Act warrant discussion. His other arguments are without merit and require no further discussion.

## II. Discussion

The Child Support Recovery Act of 1992, as amended by the Deadbeat Parents Punishment Act of 1998, Pub. L. No. 105-187, 112 Stat. 618 (1998) (hereinafter "the Deadbeat Parents Act," or "the Act"),[2] makes it a federal crime to willfully fail to pay a child support obligation to a child in another state.[3] The Act was intended by Congress to strengthen state efforts to enforce child support obligations against parents who flee across state lines. Specifically, the Act "addresses the growing problem of interstate enforcement of child support by punishing certain persons who intentionally fail to pay their child support obligations." See H.R. Rep. No. 102-771, at 4 (1992). See generally United States v. Kramer, 225 F.3d 847, 856 (7th Cir. 2000) (discussing the legislative history of the Child Support Recovery Act). Congress intended its 1998 amendments to further enhance these efforts by

_____

[2] The "operative language" of the statute remained the same, and we rely on cases from both before and after 1998. United States v. Bigford, 365 F.3d 859, 863-64 n.1 (10th Cir. 2004).

[3] The Act punishes "any person . . . who willfully fails to pay a support obligation with respect to a child who resides in another State," or "any person who . . . travels in interstate or foreign commerce with the intent to evade a support obligation." 18 U.S.C. § 228(a).

making certain violations punishable as felonies. <u>See</u> 144 Cong. Rec. S5734-02 (1998) (statements of U.S. Senators discussing need for more serious punishment for failure to pay child support).

Kukafka was convicted under §§ 228(a)(1) and (a)(3). Under § 228(a)(1), if a child support obligation remains unpaid for longer than one year, or is greater than $5000, the offender is subject to six months' imprisonment. 18 U.S.C. § 228(a)(1), (c)(1). Under § 228(a)(3), if the child support obligation remains unpaid for longer than two years, or is greater than $10,000, the offender is subject to two years' imprisonment. 18 U.S.C. § 228(a)(3), (c)(2). By their terms, these provisions apply only to "interstate" support obligations.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). <u>See</u> <u>United States v. Tykarsky</u>, 446 F.3d 458, 464 (3d Cir. 2006).

A.      <u>Commerce Clause</u>

Kukafka argues that the Deadbeat Parents Act exceeds the scope of Congress's power under the Commerce Clause and violates the Tenth Amendment of the U.S. Constitution. Because he challenges the constitutionality of the Act, we exercise plenary review over the District Court's assertion of federal jurisdiction. <u>United States v. Singletary</u>, 268 F.3d 196, 198-99 (3d Cir. 2001).

In <u>United States v. Lopez</u>, 514 U.S. 549 (1995), the Supreme Court held that the Gun-Free School Zones Act of 1990 exceeded Congress's authority under the Commerce Clause. The Court identified "three broad categories of activity" that Congress may regulate: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and (3) "those activities that substantially affect interstate commerce." <u>Id.</u> at 558-59. Focusing on the third category, the Court concluded that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." <u>Id.</u> at 567.

In United States v. Parker, 108 F.3d 28 (3d Cir. 1997), we considered Lopez, as well as our own Commerce Clause precedent, and held that the Deadbeat Parents Act was a constitutional exercise of Congress's power. We explained that:

> Failure to make required payments gives rise to a debt which implicates economic activity. This is an instance where "local activities . . . are . . . part of a national problem with a substantial impact upon interstate commerce." It is significant that the legislative history underlying the Act establishes that state efforts have been inadequate to ensure that payments owed are actually made and that, as a result, annual obligations covered by the Act total billions of dollars. Finally, unlike the statute the Court reviewed in Lopez, the [Deadbeat Parents Act] involves an unbroken chain of interstate events which begins when one parent crosses state lines and ends with interstate collection efforts.

Id. at 31 (quoting United States v. Bishop, 66 F.3d 569, 584 (3d Cir. 1995)). Based on this reasoning, we recognized that, although failure to pay child support might be a local activity, it is part of a national economic problem that substantially affects interstate commerce. Consequently, we concluded that the statute "falls within the scope of congressional authority under the Commerce Clause." Id. at 30.

Kukafka contends that Parker was effectively overruled by United States v. Morrison, 529 U.S. 598 (2000). In Morrison, echoing "both the holding of Lopez and its underlying reasoning," the Supreme Court struck down portions of the Violence Against Women Act ("VAWA"). United States v. Whited, 311 F.3d 259, 266 (3d Cir. 2002). In concluding VAWA was unconstitutional, the Court emphasized that intrastate, "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." Morrison, 529 U.S. at 613. Although it did not adopt a categorical rule, the Court reasoned that Congress could not regulate non-economic conduct "based solely on that conduct's aggregate effect on interstate commerce." Id. at 617; see also Whited, 311 F.3d at

266.

Focusing on the third <u>Lopez</u> category, "the Court provided a framework to determine whether a law regulates intrastate activity that has a substantial effect on interstate commerce." <u>United States v. Gregg</u>, 226 F.3d 253, 262 (3d Cir. 2000) (citing <u>Morrison</u>, 529 U.S. at 609-13). Under this framework, a court should consider: (1) "the economic nature of the regulated activity;" (2) "a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce;" (3) "express congressional findings regarding the effects upon interstate commerce of the activity in question;" and (4) "the link between the regulated activity and interstate commerce." <u>Gregg</u>, 226 F.3d at 262. In assessing these factors, our task is to determine whether a "rational basis" exists for concluding that the regulated activities, taken in the aggregate, substantially affect interstate commerce. See <u>Gonzales v. Raich</u>, 545 U.S. 1, 22 (2005).

With this in mind, the Deadbeat Parents Act clearly regulates an activity having a substantial effect on interstate commerce. First, the activity regulated under the Act is commercial, or economic, in nature. As characterized in <u>Parker</u>, failure to fulfill a financial obligation "gives rise to a debt which implicates economic activity." 108 F.3d at 31. Second, by regulating only obligations to out-of-state children, the Act contains an explicit jurisdictional element that limits its reach to interstate transactions. <u>Id.</u> at 30-31. Third, the Act was passed after express legislative findings about the effect of unpaid child support on interstate commerce. Indeed, when Congress passed the Act, the amount of unpaid child support had reached into the billions of dollars and amounted to a national problem adversely affecting interstate commerce. See H.R. Rep. No. 102-771, at 4-6 (1992) (discussing economic impact of failure to pay interstate child support). This same legislative history highlights the "link" between the national problem addressed by Congress and the legislation it passed. See <u>Gregg</u>, 226 F.3d at 262-63.

We therefore have no trouble determining that a rational basis exists for concluding that failure to make interstate child

support payments substantially affects interstate commerce. Accordingly, even after <u>Morrison</u>, the Deadbeat Parents Act falls within Congress's power under the third <u>Lopez</u> category.

The constitutionality of the Deadbeat Parents Act is unaffected by <u>Morrison</u> for the additional reason that the Act falls under the second <u>Lopez</u> category, which was not addressed by <u>Morrison</u>. <u>See</u> <u>United States v. MacEwan</u>, 445 F.3d 237, 244-45 (3d Cir. 2006). Under the second category, Congress may regulate "persons or things in interstate commerce." The child support payments regulated by the Deadbeat Parents Act are "things," which are interstate in nature because they must normally be transmitted through instrumentalities of interstate commerce "by mail, by wire, or by electronic transfer." <u>Parker</u>, 108 F.3d at 31. Moreover, the "persons" targeted by the Act are those who, like Kukafka, intentionally avoid payment by traveling across state lines. <u>See</u> H.R. Rep. No. 102-771, at 5 (1992) (explaining that "chances for successfully avoiding such payments increase markedly when [parents] cross state lines."). By targeting interstate child support obligations alone, Congress has ensured the Act regulates only those payments in interstate commerce and those persons who avoid their obligations by traveling across state lines.

The Act covers "persons or things" in interstate commerce, even though it punishes only those who have "willfully *fail[ed]* to pay a support obligation." 28 U.S.C. § 228(a) (emphasis added). That is, by criminalizing an individual's willful failure to pay, the Deadbeat Parents Act encourages the payment of interstate debts. <u>See</u> H.R. Rep. No. 102-771, at 6 (stating that Act promotes payment by "taking the incentive out of moving interstate to avoid payment."). In this way, the Act prevents "frustration of an interstate commercial transaction that otherwise would have occurred absent the defendant's dereliction." <u>United States v. Bailey</u>, 115 F.3d 1222, 1229 (5th Cir. 1997). Such discouragement of willful efforts to frustrate interstate commerce is a valid exercise of congressional power under the Commerce Clause. <u>See</u> <u>United States v. Sage</u>, 92 F.3d 101, 105-06 (2d Cir. 1996) ("If Congress can take measures under the Commerce Clause to foster potential interstate commerce, it surely has power to prevent the frustration of an obligation to engage in commerce."); <u>United States v. Faasse</u>,

265 F.3d 475, 486-87 (6th Cir. 2001).

We therefore conclude that the Deadbeat Parents Act properly regulates "persons or things in interstate commerce." See United States v. King, 276 F.3d 109, 113 (2d Cir. 2002) (finding the Act regulates a "thing in interstate commerce" even after Morrison); United States v. Klinzing, 315 F.3d 803, 806-08 (7th Cir. 2003) (same).[4]

In sum, we reject Kukafka's argument that Morrison overrules our conclusion in Parker that the Act is constitutional. Instead, we conclude that the Deadbeat Parents Act is a constitutional exercise of congressional power under the second and third categories of Lopez.[5]

---

[4] In Parker we did not explicitly place the Deadbeat Parents Act into Lopez's second category. Nevertheless, the reasoning of the cases adopted by Parker makes clear that, under the second Lopez category, the Act regulates "things in interstate commerce." See Sage, 92 F.3d at 107 ("[The Act] may fairly be considered a proper exercise of Congress's power *under the second category* . . .") (emphasis added); United States v. Mussari, 95 F.3d 787, 790 (9th Cir. 1996) ("The obligation of a parent in one state to provide support for a child in a different state is . . . *a thing in interstate commerce* and falls within the power of Congress to regulate.") (emphasis added); United States v. Hampshire, 95 F.3d 999, 1003 (10th Cir. 1996) ("Because the [Deadbeat Parents Act] regulates a court-ordered obligation *to pay money in interstate commerce . . .*, we conclude that Congress constitutionally exercised the power bestowed upon it by the Commerce Clause . . . .") (emphasis added).

[5] Because the Deadbeat Parents Act is a proper exercise of Congress's power under the Commerce Clause, Kukafka's Tenth Amendment challenge must fail as well. See Parker, 108 F.3d at 31 ("If Congress acts under one of its enumerated powers—here its power under the Commerce Clause—there can be no violation of the Tenth Amendment.") (quoting Mussari, 95 F.3d at 791). Notably, the Act does not attempt to regulate matters traditionally left to the states, as it does not permit a federal court "to revise the

B.      Collateral Challenge

Kukafka next argues that his indictment must be dismissed because the Divorce Decree containing his child support obligation includes a requirement that he obtain an ecclesiastical dissolution of marriage—specifically, a "Get".[6]    He contends that this provision interferes with his free exercise of religion under the First Amendment of the Constitution.  The District Court ruled that Kukafka could not attack the indictment by collaterally challenging the Divorce Decree.  Our review is plenary.  Singletary, 268 F.3d at 198-99.

The Deadbeat Parents Act requires that a defendant be subject to a "support obligation," which is defined as:

> any amount determined under a court order or an order of an administrative process pursuant to the law of a State or of an Indian tribe to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living.

18 U.S.C. § 228(f)(3).  According to this plain language, Kukafka is subject to a state court order obligating him to pay for the "support and maintenance of a child."  Kukafka does not contest that he is subject to such an order.

Rather, Kukafka challenges the provision in that order requiring him to pay for a Get.  He argues that, because of the unconstitutionality of the Get provision, the entire Divorce Decree, which contains the support obligation, must be invalid.  Because the decree is invalid, he claims, his indictment should be dismissed.

domestic relationship adjudicated by the State courts or to modify any part of a State court decree."  Sage, 92 F.3d at 107; see also United States v. Black, 125 F.3d 454, 462-63 (7th Cir. 1997).

[6] A "Get" is a divorce under Jewish law—or a document a rabbi signs to grant a divorce.  Black's Law Dictionary (8th ed. 2004).

We see no merit to this collateral challenge. Regardless of the constitutionality of the Get provision, Kukafka's conviction is based upon his support obligation, which is wholly unrelated to and plainly separate from any obligation that he pay for the Get. Clearly, a federal prosecution under the Deadbeat Parents Act is not the appropriate arena in which to litigate the terms of Kukafka's divorce. To sustain a conviction, the Act does not require a federal court to ensure the validity of each aspect of the underlying court order containing the support obligation. See United States v. Brand, 163 F.3d 1268, 1275-76 (11th Cir. 1998); cf. United States v. Leuschen, 395 F.3d 155, 159 (3d Cir. 2005) ("[18 U.S.C. §] 922(g)(1) prohibited Leuschen from possessing a firearm on account of his 1989 state conviction, irrespective of the validity of that conviction.").[7] If it did, a federal prosecution under the Act would become an avenue for re-litigating substantive issues of state family law. Congress certainly did not intend to entangle the federal government in such matters that are traditionally the province of state courts. See United States v. Molak, 276 F.3d 45, 50 (1st Cir. 2002) ("Domestic relations and family matters are, in the first instance, matters of state concern, and it would be odd for Congress to second-guess the determinations of the state courts as to the appropriate scope of child support obligations.") (citation omitted); Bigford, 365 F.3d at 869 ("There is a strong common law presumption that the federal government should not become involved in determinations of substantive issues of family law.").

In sum, the constitutionality of the Get bears no relevant relationship to the indictment in this case, and we see no reason to indulge Kukafka's effort to litigate this unrelated issue. Accordingly, we reject his collateral challenge to prosecution under

---

[7] Some courts have permitted challenges to the underlying support obligation based on the state court's lack of personal jurisdiction. See Bigford, 365 F.3d at 872 ("[The Act] allows a defendant to challenge a default child support order on the basis that the state court that rendered the judgment lacked personal jurisdiction over the defendant."); Kramer, 225 F.3d at 857 ("[A] defendant may challenge on collateral attack a default judgment that is entered without personal jurisdiction.").

the Deadbeat Parents Act.[8]

Our conclusion is supported by the fact that Kukafka has failed to present any evidence that he ever contested payment of the Get in state court proceedings. Indeed, as the government points out, and Kukafka does not dispute, he has already paid for his wife to obtain the Get. That payment, the only payment in this case that he willingly made, provides no basis for a subsequent collateral challenge to his federal prosecution under the Deadbeat Parents Act.

C.    Jury Charge

Kukafka argues that the District Court erred in instructing the jury on the willfulness element of the Deadbeat Parents Act. Specifically, he objects to the District Court's instruction that:

> [i]n determining whether the defendant acted willfully, you must first find that the defendant had the ability to pay the child support.
> . . .
> This element of the offense is satisfied if you find that the defendant had the ability to pay any part of his child support, even if he did not have the entire amount which he was ordered to pay.

(App. at 1018.) Kukafka argues that the instruction lowered the government's burden of proof by allowing the jury to find a willful violation "merely by determining that [he] had a spare quarter in his pocket one day in the year . . . ." (Appellant's Br. at 22.) Although Kukafka objected to this instruction before the District

_____

[8] Notably, every court of appeals that has addressed merits-based collateral challenges to prosecutions under the Deadbeat Parents Act has reached the same conclusion. See United States v. Kerley, 416 F.3d 176, 178 (2d Cir. 2005) ("Every circuit that has addressed the issue has stated that defendants in [Deadbeat Parents Act] prosecutions cannot collaterally challenge the substantive merits of the underlying support order.").

Court, he did so on a different basis;[9] accordingly, our review is for plain error. United States v. Zehrbach, 47 F.3d 1252, 1260 (3d Cir. 1995). In our review, we consider the totality of the instructions on willfulness, not focusing on a particular paragraph in isolation. See United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir. 1995).

The "ability to pay" is not an element of a Deadbeat Parents Act offense. Instead, "inability to pay . . . provides a defense to liability . . . and the defendant is free to present evidence that . . . his income was not sufficient, after meeting his basic subsistence needs, to enable him to pay any portion of the support obligation." United States v. Mattice, 186 F.3d 219, 228-29 (2d Cir. 1999). Kukafka presented such a defense, essentially asking the jury to find that he did not act willfully because he was unable to pay. Accordingly, the District Court properly instructed the jury that "[i]n determining whether the defendant acted willfully, you must first find that the defendant had the ability to pay the child support." This instruction conveyed to the jury that it could not find willfulness unless it had determined that Kukafka could pay the support obligation. See United States v. Smith, 278 F.3d 33, 40 (1st Cir. 2002) ("In the context of the record as a whole, the instruction directed the jury to determine that Smith had the ability to pay before it could find that he willfully failed to pay.").

---

[9] Kukafka argued to the District Court that it should have instructed the jury on the Deadbeat Parents Act's "rebuttable presumption," which the District Court did not do. See 18 U.S.C. § 228(b) ("The existence of a support obligation that was in effect for the time period charged in the indictment . . . creates a rebuttable presumption that the obligor has the ability to pay the support obligation for that time period."). He does not, however, raise this issue on appeal. Accordingly, we only address Kukafka's contention that the District Court erroneously instructed the jury on his ability to pay. We note that, to the extent that the District Court erred by not instructing the jury on the rebuttable presumption, such error would be harmless. It could only have benefitted Kukafka to not have to overcome a rebuttable presumption that he could pay the obligation.

Kukafka's contention that the instruction misled the jury is contradicted by the record. The jury instructions plainly show that the District Court told the jury that Kukafka's refusal to pay his support obligation had to be "voluntary and intentional," and that Kukafka had to be aware of "the unlawful nature of his acts." Moreover, the Court explained that Kukafka had a right to keep enough money to subsist and to meet his basic personal needs. The Court did not invite the jury to convict Kukafka if it believed he had some spare money on a given day. Accordingly, the District Court's instruction was not erroneous.

## III. Kukafka's Sentence

Finally, Kukafka contends, and the government agrees, that the District Court mistakenly imposed a two-year concurrent sentence with a $100 special assessment for Count I of the indictment. Count I charged a violation of 18 U.S.C. § 228(a)(1), which carries a maximum prison sentence of six months and is a Class B misdemeanor. See 18 U.S.C. § 228(c)(1); 18 U.S.C. § 3559(a)(7). A Class B misdemeanor carries a special assessment of $10. See 18 U.S.C. § 3013(a)(1)(A)(ii). There is no challenge to the two-year sentence imposed on Count II. Therefore, we will remand the case to the District Court for the sole and limited purpose of correcting the sentence regarding Count I to reflect the applicable statutory provisions. See United States v. Dixon, 308 F.3d 229, 236 (3d Cir. 2002); 18 U.S.C. § 3742(f)(1).

## IV. Conclusion

For the foregoing reasons, we will affirm the judgment of conviction, and will remand the case to the District Court to correct the sentence on Count I only.